DePaolo *v.* DeRomo, Appellant.

Argued January 26, 1943. Before MAXEY, C. J.; DREW, LINN, PATTERSON, PARKER and STEARNE, JJ.

*R. Lawrence Coughlin,* with him *Donald O. Cough-lin,* for appellant.

*Max Rosenn,* with him *Andrew Hourigan, Jr.,* and *John Memolo,* for appellee.

OPINION BY MR. JUSTICE DREW, March 22, 1943:

In this proceeding in equity the learned chancellor, after an exhaustive accounting and numerous hearings, found in favor of plaintiff, A. DePaolo, and when that finding was affirmed by the court en banc and final decree entered thereon, the defendant, Michael DeRomo, took this appeal.

The pertinent facts, as accurately determined by the chancellor, are as follows: DeRomo, on July 22, 1937, made a contract with the Pittston-Duryea Coal Company to mine the coal in its Stevens Shaft mine in Exeter Borough, Luzerne County, Pennsylvania. Subsequently, defendant formed the DeRomo Mining Company, the capital stock of which he owned or controlled in its entirety, to do the mining. The Mining Company, with DeRomo in complete control, took possession and was operating the colliery on July 22, 1938, when plaintiff and defendant and the DeRomo Mining Company entered into a contract, supplemented by an agreement dated July 28, 1938, under which plaintiff took possession and control of the operations of the Mining Company on August 1, 1938, and undertook to mine the coal in the Stevens Shaft in accordance with the terms of the contract between the Pittston-Duryea Coal Company and DeRomo.

The contract between plaintiff, defendant and the Mining Company provided, in substance, that defendant assign and transfer all of the capital stock of the Mining Company to the plaintiff, for $75,000.00. This sum

was to be paid to DeRomo by deductions by him of 15 cents from the sale price of each ton of coal mined and sold to the Pittston-Duryea Coal Company under the terms of the contract existing between it and DeRomo. It further provided that all of the capital stock issued to DePaolo was to be endorsed in blank and deposited with DeRomo as security for the faithful performance of the contract, and that when the $75,000.00 was fully paid, one-half of the total number of shares was to be surrendered to DePaolo and the remaining one-half was to become the property of DeRomo so that, after full payment, the two were to be equal owners of the DeRomo Mining Company. In the event that DePaolo breached any part of the contract DeRomo had with the Pittston-Duryea Coal Company, however, DeRomo was to become sole owner of all the stock. DePaolo also agreed to furnish all the capital necessary for the mining and to deposit $2,500.00 in the First National Bank of Kingston as collateral security for the payment of any existing bills for labor and material in the event he breached his contract. No withdrawals could be made on this account except on the joint signature of DeRomo and DePaolo. In lieu of wages or salary, the entire profits of the Mining Company were to belong to DePaolo until the $75,000.00 was paid. Pursuant to this contract, DePaolo went into control of the operations of the Mining Company and continued in possession until March 15, 1939.

The operation was being performed satisfactorily by DePaolo when, on November 7, 1938, DeRomo served notice on him to quit and remove from the Stevens Shaft colliery alleging breach of contract. This notice, signed by DeRomo individually, started the controversy which culminated in this litigation. There is no evidence in the record that the Mining Company concurred in the action taken by DeRomo although it was one of the parties to the agreement of July 22, 1938. Nothing further was done pursuant to this notice to quit until March 15, 1939, when DeRomo's representatives, with his express au-

thority, summarily removed and evicted DePaolo from the mine. It appears that DeRomo then served written notice on DePaolo on March 24, 1939, that as of March 15, 1939, he was taking full charge, control and possession of the mine, notifying DePaolo to remove himself, and that thereafter DePaolo's employees would be prohibited from entering the property because of alleged breaches in the contract between the parties. This notice was likewise signed by the defendant individually and not by the Mining Company.

The record also shows that during November of 1938 the defendant caused three warrants to issue for the arrest of DePaolo for trespassing and that they were subsequently abandoned; and that he communicated with creditors of DePaolo and the Mining Company with a view to embarrass DePaolo in his further operation of the mine. The chancellor found that "DeRomo improperly and forcibly took control and possession of the operations of the DeRomo Mining Company on March 15, 1939, and wrongfully dispossessed DePaolo." He further found that the Mining Company, while under the control of DePaolo, complied with all the engineering requirements of the contract existing between De Romo and the Pittston-Duryea Coal Company to the complete satisfaction of the mining engineer of that Company, that the operation was conducted in a competent mining manner, that DePaolo faithfully performed his contract with DeRomo, and that his eviction was unwarranted and improper.

It is undisputed that during the time DePaolo was in charge of operations the production of coal was greatly increased over the production for the first seven months of 1938. From August 1, 1938, to March 13, 1939, the last day the colliery was under the supervision of DePaolo, it produced 61,228.94 tons of coal and De Romo deducted and received 15 cents per ton thereon, amounting to $9,194.34, to apply upon the consideration of $75,000.00 agreed to be paid by DePaolo to DeRomo as the purchase price of the stock.

This proceeding is against DeRomo individually. The DeRomo Mining Company, although a party to the original agreement between plaintiff and defendant, is not a party to this suit, and is not here to account for any claims which DePaolo may have, if any, against it. The breach here and the damage to DePaolo was caused solely by the intemperate acts of DeRomo individually. There is no evidence here that the Mining Company participated in his wanton breach.

The learned chancellor concluded that "DePaolo did not breach the contracts . . . but the said contracts were breached by DeRomo in having evicted DePaolo and thereby making it impossible for him to carry out the terms of said agreements", and decreed that defendant assign to plaintiff all of his right, title and interest in the special deposit account of $2,500.00 and that he pay plaintiff $9,194.34 damages for having breached the contract.

A careful review of the record will convince anyone that the facts as found by the chancellor, and approved by the court below, are fully supported by the evidence. The facts as found, being supported by the evidence, have the effect of a jury verdict and are binding upon us: *Weiss v. First Nat. Bk. of Scranton,* 321 Pa. 365. Indeed, contrary findings could not be upheld on this record, which is overwhelming in support of the chancellor's findings. We now turn to the matter of damages and the decree of the court below in respect thereto.

There can be no doubt as to the propriety of the ruling that defendant must assign to plaintiff any interest he may have in the special deposit account of $2,500.00. This deposit was made as collateral security for the payment of any debts for labor and materials in the event of a breach of the contract by DePaolo. Since the only breach was by DeRomo individually, he can have no defense to the right of DePaolo to get back his money. Although there is some disputed testimony that on March 15, 1939, the accounts payable of the Mining Company exceeded $10,000.00, there is no testimony that the

remaining assets of the Company were not sufficient, and have not been used, to liquidate all such obligations. The plaintiff offered testimony to show that on that date the net assets of the Company, including the $2,500.00 deposit, were $17,727.60. We, therefore, conclude that it was proper to order DeRomo to assign any interest he had in the deposit account.

The court below granted plaintiff a reimbursement of $9,194.34, which was the amount received by defendant under the terms of the contract he breached, being the 15 cents per ton of all the coal mined while DePaolo was in charge and not receiving either salary or wages. This money was paid and received on account of the purchase price of $75,000.00 for one-half of the capital stock of the Mining Company. The contract provided that plaintiff was to receive all the profits of that Company, which profits were to be computed after there had been first deducted from the proceeds of the coal sold the sum of 15 cents per ton, which amount was to be applied to the purchase price of the stock. This money, therefore, was money paid by plaintiff for, otherwise, it would have remained in the Mining Company as profits for his benefit had it not been paid out under the terms of the contract between him and DeRomo. It need only be said that "The amount of the plaintiff's expenditure, reasonably made in performance of the contract or, in necessary preparation therefor, is included in compensatory damages . . .": Restatement, Contracts, section 333. See also *Rogers v. Davidson,* 142 Pa. 436. Further, the defendant having broken that contract cannot be heard to say that he can take all its benefits and refuse plaintiff any benefits under it. Having repudiated and breached his contract, he will not be permitted to enrich himself unjustly thereby. The plaintiff is entitled to reimbursement.

We find no merit in the other assignments of error. The case was fairly tried and properly disposed of by the learned chancellor and court below, and all the assignments of error are, therefore, overruled.

Decree affirmed.